**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI, ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| **PORTERS BUILDING CENTERS, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SPRINT LUMBER, INC.,**<br><br>**SCOTT LADEROUTE,**<br><br>**JERRY DOWNEY,**<br><br>**JESS REYNOLDS,**<br><br>**SHEILA HIGDON,**<br><br>**RAY MENG,**<br><br>**Defendants.** | ) | Case No. 16-cv-6055<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff Porters Building Centers, Inc. ("Porters"), for its Complaint for Damages and Injunctive Relief against its competitor, Defendants Sprint Lumber, Inc. and its owner, Scott Laderoute (collectively, "Sprint Lumber"), and Porters' former employees, Jerry Downey, Jess Reynolds, Sheila Higdon, and Ray Meng (the "Former Employees"), states and alleges as follows:

**Nature of the Case**

1. In this lawsuit, Porters seeks to protect its confidential information and trade secrets from continued misappropriation and unlawful use by Defendants, as well as obtain damages arising from Defendants' wrongful actions in soliciting its employees and customers and destroying its protected electronic information. These wrongful acts have taken place over

the course of nearly five months through dozens of meetings and communications between Sprint Lumber and the Former Employees. Defendants conspired on how to "capture" Porters' sales, copy its confidential information and trade secrets, and thereafter "dump" that information from Porters' systems. All the while, the Former Employees continued to be employed by Porters—affirmatively undercutting its business as they collected regular paychecks—even remarking to Sprint Lumber during work hours that they "will be bearing gifts" and boasting that "[a] monopoly is great."

2. Defendants' egregious conduct has caused and continues to cause substantial harm to Porters and the Porter family. In this lawsuit, Porters asserts claims for: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (2) computer tampering in violation of §§ 569.095-.099, RSMo.; (3) violation of the Missouri Uniform Trade Secrets Act; (4) breach of restrictive covenants for misappropriating confidential information and soliciting customers and employees; (5) breach of the duty of loyalty; (6) tortious interference with a business expectancy; and (7) civil conspiracy. Porters seeks relief in the form of an injunction to prevent continued harm and damages to recover for harms already incurred.

## The Parties

3. Plaintiff Porters Building Centers, Inc., is a Missouri corporation with its principal place of business in Kearney, Missouri.

4. Defendant Sprint Lumber, Inc. is a Missouri corporation with its principal place of business in St. Joseph, Missouri. Sprint Lumber is a direct competitor of Porters Building Centers in northwest Missouri and northeast Kansas.

5. Defendant Scott Laderoute is the owner and controller of Defendant Sprint Lumber and, on information and belief, lives in Platte City, Missouri.

6. Defendant Jerry Downey resides in St. Joseph, Missouri. Downey was an employee of Porters for more than 12 years and was employed as a manager of the Elwood, Kansas location. In this role, Downey had training and oversight responsibilities for the staff, as well as daily interaction and sales with Porters' customers.

7. Defendant Jess Reynolds resides in Atchison, Kansas. Reynolds worked directly under Defendant Downey and had primary responsibility for building and maintaining customer relationships and handling sales inside the building located in Elwood, Kansas.

8. Defendant Sheila Higdon resides in Agency, Missouri. She worked directly under Defendant Downey and was primarily responsible for building and maintaining customer relationships and handling sales outside the building, including sales of lumber and building materials to contractors, a significant source of Porters' repeat business.

9. Defendant Ray Meng resides in Atchison, Kansas. He worked directly under Defendant Downey. Meng worked in the lumber yard and was responsible for preparing deliveries to homebuilders and contractors and ensuring those deliveries arrived on time.

**Jurisdiction and Venue**

10. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case presents a federal question regarding whether Defendants' conduct violates a federal statute.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property is situated, in this judicial district.

## Allegations Common to All Counts

### I. Porters Building Centers and the Competitive Market for Lumber and Building Supplies

12. Porters is a family owned provider of high-quality lumber and building supplies, providing direct wholesale services to homebuilders and contractors throughout northwest Missouri and northeast Kansas. In addition, Porters provides hardware retail services to homeowners through its four stores located in Cameron, Missouri; Kearney, Missouri; Laurie, Missouri; and Elwood, Kansas.

13. Since its founding in 1952, Porters has continuously developed and fine-tuned processes and techniques to better serve its customers, including inventory management procedures, delivery logistics, customer service protocols, and purchasing strategies. These time-tested systems and processes help Porters build and maintain the customer relationships and repeat business that are at the core of its business model and mission.

14. As a manager of the Elwood, Kansas location, Defendant Downey had intimate access to proprietary company information and processes, as well as customer lists and contact information. In addition, Defendants Jess Reynolds, Sheila Higdon, and Ray Meng each worked directly under Defendant Downey and, collectively, have thorough knowledge of Porters' services, operations, trade secrets, business plans, development plans, client lists, prospect lists, and proprietary analyses.

15. Defendant Sprint Lumber is the primary competitor to Porters within the region. According to its website, Sprint Lumber provides "rough-in lumber, hardwoods, treated lumber, composite decking, doors, windows, and interior trim" to "the Professional Builder, the Remodeler, and the Homeowner." *See* Sprint Lumber, www.sprintlumber.com/index.html,

attached as **EXHIBIT A**. Sprint Lumber has locations in St. Joseph and Platte City, Missouri, and makes deliveries throughout the region. *Id.*

## II. The Restrictions and Benefits Associated with Employment at Porters

16. At the time of their employment by Porters, the Former Employees received a copy of the "Porters Building Center Employee Handbook" (the "Handbook"), which detailed not only the policies and restrictions required by their employment at Porters, but also the benefits they receive as employees.

17. The Former Employees each signed an acknowledgement agreeing to the policies, restrictions, and benefits detailed in the Handbook. The Handbook and signed acknowledgment pages are attached as **EXHIBIT B**.

18. Although the Handbook did not constitute a contract of employment for purposes of the at-will doctrine, the Former Employees' signed acknowledgement of the Handbook contemplates that they would, among other things, undertake certain duties and responsibilities in exchange for valuable benefits, including paid vacation time, holiday pay, sick pay, personal time off, and bereavement leave.

19. Through their employment at Porters, the Former Employees undertook obligations with respect to protecting Porters' confidential information and trade secrets, along with obligations to refrain from soliciting Porters' customers, clients, potential clients, or employees during their employment.

20. With respect to confidentiality, a provision in the Handbook titled "Standards of Conduct," states:

> Employees may be exposed daily to a great deal of confidential information concerning the Company, its business and its employees, including, but not limited to, contracts, customer lists and information, pricing information, marketing information, vendor/supplier information, financial information and

> personnel information. None of this information, including the method or procedure used for handling a specific matter or business relationship, should be discussed with anyone outside of the Company, including relatives or friends, either during the period of your employment with the Company or any time thereafter. Confidential information should not be discussed with other employees except as necessary for conducting Company business. Inappropriate or unauthorized discussion or disclosure of the Company's confidential information during the course of employment may result in disciplinary action up to and including immediate discharge. Further, the Company may take appropriate legal action against an employee or former employee in the event of any misappropriation of the Company's confidential information by such individual, whether during or following termination of the individual's employment with the Company.

*Id.* at Porters_000032.

21. With respect to the Former Employees' non-solicitation obligations, a provision in the Handbook titled "No Solicitation," states:

> In the interest of maintaining a proper business environment and preventing interference with work and inconvenience to others, employees may not distribute literature or printed materials of any kind, sell merchandise, solicit financial contributions or solicit for any other cause during working time. Employees who are not on working time (e.g., those on lunch hours or breaks) may not solicit employees who are on working time for any cause or distribute literature of any kind to them. Furthermore, employees may not distribute literature or printed material of any kind in working areas at any time.
>
> Non-employees are likewise prohibited from distributing material or soliciting employees on the Company premises at any time.

*Id.* at Porters_000027.

22. With respect to Porters' tangible and intellectual property, a provision in the Handbook titled "Return of Company Property," states:

> Employees are responsible for all Company property, materials and/or written information issued to them or in their possession or control. This includes keys, equipment, tools, identification cards, uniforms (if the Company's property), this Handbook, and any other business related items which may be delivered to you in the course of your employment. Employees must return all such property to the Company immediately upon request or upon termination of their employment for any reason, whether voluntary or involuntary. In the event an employee or former employee fails to return any Company property upon request or upon termination

> of their employment, the employee may be held financially and legally responsible, and may be subject to prosecution and criminal liability in accordance with applicable law. Porter's Building Center may take any and all legal action deemed appropriate to recover or protect its property. Further, employees must settle all outstanding Company accounts immediately upon termination of their employment before they will be issued their final paycheck.

*Id.* at Porters_000016.

23. Similarly, with respect to the Former Employees' use of internet and e-mail, a provision in the Handbook titled "Internet/E-Mail Policy," states:

> If you use the Company's computers to send and receive E-mail, please observe the following rules: (1) all electronic communications are considered to be the exclusive property of the Company, (2) computer equipment is to be used only for business purposes, (3) there is no expectation of privacy with regard to E-mail, and (4) make sure that only appropriate business language is used in E-mail. **The Company has the right, in its discretion, to monitor all electronic communications made using the Company's property.** The Internet should be used for business purposes only - no sending personal mail or chain letters, no spending excessive amounts of time on the Internet, playing games, printing multiple copies of documents, or engaging in online "chat groups".

*Id.* at Porters_000028 (emphasis original).

24. The Handbook also has specific provisions providing paid vacation time, holiday pay, sick pay, and bereavement leave. *See id.* at Porters_000017-21. For employees that voluntarily resign, the Handbook provides that the employee will be paid for their accrued and unused vacation leave so long as they provide adequate prior notice of their voluntary resignation. *Id.* at Porters_000015-16.

25. The Former Employees were specifically aware of and agreed to restrictions in these provisions, as well as accepted the benefits afforded by them. In addition, Defendant Downey was directly responsible for ensuring that employees are aware of and agree to the policies and restrictions contained in the Handbook as a material condition of their employment.

## III. The Unlawful Conduct by Defendants in Violation of Federal and State Law

26. On the evening of Friday, April 22, 2016, Defendant Downey e-mailed Kent Porter, the owner and operator of Porters, and gave notice of his intention to resign one week later. In the e-mail, Defendant Downey expressed that he was going "to a competitor," Sprint Lumber, and requested to be paid for his unused vacation time, despite recognizing that he is ineligible for it under the Handbook for giving only one week of notice. He further expressed that Defendants Reynolds and Higdon would also be leaving

27. Defendant Reynolds submitted his notice of resignation minutes later. Defendant Higdon then submitted her notice of resignation on Sunday, April 24, 2016. Both Defendants Reynolds and Higdon indicated that they intended to start at their new position on May 2, 2016.

28. The resignation notices are attached as **EXHIBIT C**. Unbeknownst to Porters, the Former Employees had been directly competing against the company and undercutting its business for more than four months.

### A. The Unauthorized Destruction of Company Property and Electronic Data

29. Shortly after the Former Employees resigned, Porters discovered that Defendant Downey had deleted the contents of his company issued e-mail account, jerry@portersbuilding.com, which was hosted by Gmail.

30. Due to the nature of Defendant Downey's role within Porters, the e-mail contents that were deleted included proprietary company information, trade secrets, and customer contact information and lists. This information is held strictly confidential by Porters, including through password protection of the computer and internet accounts.

31. Under Porters' E-Mail Policy, e-mails on the jerry@portersbuilding.com account are company property and current and former employees are specifically required to return that

property to Porters. *See* Handbook, Ex. B, at Porters_000016. Porters' employees are not authorized to delete the contents of e-mail accounts or otherwise destroy company property. *Id.*

32. In addition, Defendant Higdon performed a factory reset of her Porters-issued mobile device, permanently deleting the information on that device. Because this cell phone was her primary method of contacting and communicating with Porters' long-standing clients and customers, it contained confidential customer contact information and lists.

33. Defendant Higdon was not authorized to delete the contents of her mobile computing device or otherwise destroy company property.

### B. The Efforts to Form a Monopoly through Misappropriation, Solicitation, and Secrecy

34. Although Defendant Downey affirmatively deleted the contents of the company e-mail account, he also used another e-mail account under his wife's name, "ajdowney47@gmail.com."

35. Defendant Downey used the "ajdowney47@gmail.com" account on Porters' computers during work hours and maintained that account logged-in on Porters' systems without password protection. Consistent with Porters' Internet and E-Mail policy, Porters has the right to monitor and view these communications on its computers.

36. Defendant Downey's e-mails on Porters' system reveal an orchestrated effort to hamper Porters' business, misappropriate its confidential information and trade secrets, and raid its employees and customers, all to the benefit of Defendant Sprint Lumber and its owner, Defendant Scott Laderoute. These emails are attached as **EXHIBIT D** and redacted to protect confidential information and trade secrets from further disclosure.

37. Beginning in February 2016, Sprint Lumber and the Former Employees, lead by Downey, conspired on the best way to effectuate their plan to "monopolize the contractor/builder

business in this area." *Id.* at Porters_000065. In an email dated Wednesday, February 24, 2016 at 1:20 pm, Defendant Downey forwarded an email to Defendant Laderoute containing a document titled "Employee info." *Id.*

38. The attachment detailed the plan to solicit Porters' employees and attempt to bring them over to Sprint Lumber in organized waves to keep expenses low for Sprint Lumber:

> Scott,
>
> Here is some background information and what I am thinking in the big picture of our possible merger. Overall, there are 6 employees from Porters I would like to see come over. Because myself, Sheila and Jess would initially bring the majority of our sales, I feel it is important to bring us initially. Ideally, I would like to bring the three of us, and in addition, Daryl Wyatt (driver supervisor/sales), Ray Meng, (Yard Manager), and Joe Ramseier (Utility). I do understand this would be a large initial expense, so maybe there is an option to start with the core three, then bringing the other three as soon as possible once the sales take off and deliveries increase.

*Id.* at Porters_000062 (emphasis added).

39. The attachment, originally prepared by Reynolds and forwarded to Laderoute by Downey, provides confidential information to Sprint Lumber about Porters' operations, including current employee salaries, rental costs, and business structure. *Id.* at Porters_000062.

40. The intentions were clear: creating a monopoly in favor of Sprint Lumber that puts Porters out of business:

> I feel that if this move happens, you will see a large increase in sales immediately. I also feel that all listed here are necessary components to pull this off. Everyone on this list is more like family than co-workers, and I have a long running relationship with them all. I would need to assure them there is a place for them if this move takes place. The employees on this list have been loyal to me and in order for this to work I need to take care of them in return. In my opinion, Sprint would monopolize the contractor/builder business in this area. Currently, 85% of our business is contractor business, the remain 15% retail I have tried for years to talk Kent into making our store a contractor yard, and relocate the retail business to St. Joe. This move to Sprint would most likely force him to look at a retail store elsewhere, because I am certain we would take virtually all of the contractor business with us. He does not own the building...He is renting it from his sister who is the property owner, and paying $8,000.00/month. To my knowledge, there is no one else that could come to Porters and bring the contractor sales, and I am certain there no one out there that could sway our customers we have to buy from someone other than us. With all of us, you will not only be getting years of knowledge and experience in the management and sales side, but would also have built-in DOT certified driver capabilities, and extensive ready-to-go yard experience.

*Id.* at Porters_000065 (emphasis added).

41. Throughout subsequent emails ranging from February to April 2016—during which the Former Employees continued to be employed for Porters—Defendants finalized and implemented their plans. On March 4, 2016, Defendant Laderoute affirmatively pressed the Former Employees to bring their customers, stating "I am willing to honor the vacation to expedite the move. I would like to capture the spring sales." *Id.* at Porters_000072.

42. With respect to the vacation, Defendant Downey sought to receive credit at Sprint Lumber for the same vacation time he would later seek reimbursement for from Porters. *See id.*

43. In multiple emails, Defendant Downey and Laderoute discussed whether they could stagger the departures. Throughout the discussion, the primary concern was how to best position themselves to call on Porters' customers. On March 10, 2016, Defendant Laderoute informed Defendant Downey that "I understand your concern over [Defendant Meng] needing to stay to accommodate the customers. It could probably work out if he did want to come at the same time ***but would take some hustling to notify all the customers.***" *Id.* at Porters_000078.

44. By March of 2016, Sprint Lumber agreed to set up Sprint e-mail accounts, cell phones, and business cards for the Former Employees. On March 17, 2016, Defendant Downey requested "an email with Sprint i[n] the name" for the Former Employees and noting that "it would be helpful to have it set up a few weeks before the move":

**thoughts**
9 messages

**Angie Downey** <ajdowney47@gmail.com> Thu, Mar 17, 2016 at 11:04 AM
To: Scott Laderoute <scott@sprintlumber.com>, ryan@sprinlumber.com

My head is spinning. Dont know if its due to the stress of all this, laughing so hard, or all the beer. But we made a deal, though some parts are foggy to be honest. So I was thinking that if you guys could set up emails for Sheila, Jess, and myself. When we start communication, an email with Sprint i the name will be helpful. And I think it would be helpful to have it set up a few weeks before the move. Vasut specifically like sto talk through email. Let me know your thoughts,JD

*Id.* at Porters_000086 (emphasis added). The notation that "Vasut" prefers email refers to a customer of Porters that builds homes in the area.

45. Sprint Lumber agreed with this plan, stating "I am excited about this transition! We will get email address[e]s assigned beforehand." *Id.* at Porters_000087.

46. On March 28, 2016, after Laderoute learned that their plans had been leaked by one or more of Porters' customers, Laderoute stressed the importance of secrecy to Downey. *Id.* Laderoute stated, "I will speak to him to keep it quiet. St. Joe small town gossip gets started easily!" *Id.* On information and belief, Porters' customers were aware of these plans because the Former Employees had begun to solicit their business on behalf of Sprint Lumber.

47. Defendants also discussed the plan to copy Porters' protected trade secrets and confidential information and thereafter "dump all the information out of them":

**Angie Downey** <ajdowney47@gmail.com> Wed, Mar 30, 2016 at 4:13 PM
To: Scott Laderoute <scott@sprintlumber.com>

Ok, I have some more questions. Things that are on my mind. At some point Sheila and I are going to need to get our new phones so we can dump all the information out of them into our new phones. And before I leave I will empty my phone as will Sheila. I would guess about two weeks before. That make sense for you?

*Id.* at Porters_000083.

48. Laderoute agreed on March 31, 2016, stating "I will order computers today for everyone to back up their phones. We will need you all to stop by and backup a copy shortly before you give notice. What phones does everyone want?" *Id.* at Porters_000084. Downey responded the same day, stating that "since Porters owns the phones and the account we would get different numbers. However[,] just want to dump in all our information such as contacts and emails we have stored now." *Id.*

49. On April 5, 2016, Laderoute informed Downey that the new phones and phone numbers arrived, noting that "[w]e should be able to order business cards now." *Id.* at Porters_000102.

50. At times, the Former Employees expressed concern about the scheme and their overall fit within Sprint Lumber, despite recognizing that "this is the best deal for all of us and you. A monopoly is great." *Id.* at Porters_000104 (Apr. 5, 2016, at 1:49 p.m.).

51. However, these concerns were quickly forgotten. By April 6, 2016, Downey informed Laderoute that "Sheila called me this morning and asked if she moves forward and starts talking to her customers. I told her yes." *Id.* at Porters_000113. Downey also affirmatively invited Laderoute to tour the Porters facility, stating that he "[w]ould still like to quickly show you this place and a few certain things. May make more sense when you physically see things." *Id.*

52. Two hours later, at 2:54 pm, Downey sent Laderoute another email during work hours providing him detailed information about Porters' inventory, its delivery operation, and strategies for serving various localities. *Id.* at Porters_000114-15. Downey stressed that "the one thing about that we bring to the table is sales when we come," stressing that "[w]e will be bearing gifts." *Id.*

53. On April 8, 2016, the Former Employees informed Sprint Lumber about a preferred vender they "buy quite a bit of siding from." *Id.* at Porters_000121.

54. From this point, the Former Employees continued to work for Porters for more than two weeks. On information and belief, during that time, they continued to call on Porters' customers for purposes of soliciting them for Sprint Lumber, misappropriate Porters' confidential information and trade secrets, and directly compete against Porters, often during work hours.

55. Porters has suffered, and continues to suffer, irreparable harm as a result of Defendants' unlawful actions.

56. This case presents special circumstances because Defendants' wrongful conduct is intentional, without substantial legal grounds, reckless, punitive, and with intent to hinder legal rights. Accordingly, an award of attorneys' fees incurred by pursuing this action is warranted.

**Count I**
**Computer Fraud and Abuse Act**
**(18 U.S.C. § 1030(g))**

57. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

58. Defendants Downey and Higdon accessed Porters' protected computers when they logged into Porters' computer system and mobile devices to access the company email.

59. By knowingly deleting the e-mail information contained in Porters' accounts, along with the confidential information, trade secrets, and customer contacts in those accounts, Downey and Higdon intentionally or recklessly caused damage and loss to Porters and its protected computers.

60. By accessing Porters' computer systems and mobile computing devices, the Downey and Higdon accessed protected computers connected to the internet and used in interstate commerce.

61. Although the Downey and Higdon had authorization to use Porters' protected computers, at no point were they authorized or permitted to delete or alter information on those computers. Accordingly, their deletion of Porters' company information exceeded their authorized access.

62. The deletion and destruction of protected electronic information has caused and within one year will cause additional losses in excess of $5,000.00, including costs to recover or attempt to recover destroyed information, updates to protected computer systems, lost revenue, and expenses to associated with replacing the destroyed information.

63. The deletion of this information conferred a direct value onto Defendants by providing them competitive advantages and increased revenues in excess of $5,000.00.

64. Defendants Sprint Lumber and Laderoute conspired with the Former Employees to commit the acts alleged herein.

65. Defendants had intent to defraud Porters by deleting its information and affirmatively keeping those acts secret. These acts were made for Defendants' own personal gain in contravention to their duties to Porters as imposed by state and federal law.

WHEREAS, Plaintiff Porters respectfully requests the Court enter judgment against Defendants and in favor of Porters and award Porters injunctive relief to prevent continued irreparable harm and money damages to compensate it for the harm caused by Defendants and any other relief the Court deems just and proper.

**Count II**
**<u>Computer Tampering</u>**
**(Missouri Revised Statutes §§ 537.525, 569.095-.099)**

66. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

67. Defendants Downey and Higdon accessed Porters' computers and mobile devices when they logged into those systems to access the company email.

68. By affirmatively deleting the e-mail information contained in Porters' accounts, along with the confidential information, trade secrets, and customer contacts in those accounts, Downey and Higdon knowingly caused damage and loss to Porters and its protected computers.

69. In addition, Downey and Higdon knowingly disclosed and took data and confidential information residing in Porters' computer systems.

70. Although Downey and Higdon had authorization to use Porters' protected computers, they at no point were authorized or permitted to delete or alter information on those computers. Nor were the Former Employees authorized to disclose or take confidential information for purposes of providing it to a competitor. Accordingly, their disclosures and deletions of data were without authorization and they lacked reasonable grounds to believe that they had such authorization.

71. Higdon's factory reset of Porters' mobile device modified and destroyed a data storage device contained within Porters' computer system knowingly and without authorization.

72. Defendants Sprint Lumber and Laderoute conspired with Downey and Higdon to commit the acts alleged herein and they know or believe that they received, retained, or used the data and confidential information in a manner such as to constitute computer tampering.

73. As a result of Defendants' conduct, Plaintiff Porters suffered and will continue to suffer damages, including lost revenue, costs to verify the loss, recover or attempt to recover destroyed information, updates to protected computer systems, and expenses associated with replacing the destroyed information.

74. Defendants' breach was outrageous such as to constitute evil motive or reckless indifference to Porters' rights, warranting an award of punitive damages.

WHEREFORE, Plaintiff Porters respectfully requests the Court enter judgment against Defendants and in favor of Porters on Count II of its Petition and award it compensatory damages, costs, injunctive relief, and its reasonable attorneys' fees.

**Count III**
**Missouri Uniform Trade Secrets Act**
**(Missouri Revised Statutes §§ 417.450-.467)**

75. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

76. The information concerning Porters' business operations, logistics, compensation structures, business structure, business analyses, and customer contacts are confidential and proprietary information that constitute trade secrets.

77. These processes and compilations of information were developed over years of trial-and-error improvements and investments and, as an integrated system, are not easily replicated by others. Porters protects this information by keeping it under password protection, limiting its use to certain employees, and imposing policies to prevent its disclosure. Defendants' months-long coordinated efforts to acquire this information demonstrates its value and lack of knowledge to others within the industry.

78. Defendants knew or had reason to know that they had disclosed and used trade secrets without Porters' consent. The Former Employees disclosed the trade secrets to Porters' direct competitor, Sprint Lumber, and thereafter used those trade secrets to compete against Porters.

79. Sprint Lumber and Laderoute knew or had reason to know that the trade secret was derived through improper means and by individuals who owed a duty to Porters to maintain its secrecy or limit its use.

80. The Former Employees held positions within Porters such that they had the opportunity to influence customers, particularly over a four-month period.

81. As a result of Defendants' conduct, Porters suffered and continues to suffer damages.

82. The Former Employees' breach was outrageous such as to constitute evil motive or reckless indifference to Porters' rights, warranting an award of punitive damages.

WHEREAS, Plaintiff Porters respectfully requests the Court enter judgment against Defendants and in favor of Porters and award Porters injunctive relief to prevent continued irreparable harm and money damages to compensate it for the harm caused by Defendants.

## Count IV
## Breach of Restrictive Covenants

83. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

84. At the time of their hiring, the Former Employees each signed the Handbook, which expressly provides restrictions concerning the handling of confidential information and trade secrets, as well as solicitation by employees of any form.

85. The provisions of the handbook provided valuable benefits to the Former Employees, the acceptance of which bound the Former Employees to the restrictive covenants.

86. The Former Employees, by sharing confidential information and trade secrets, deleting information, and soliciting employees and customers while employed with Porters and afterward, violated these agreements.

87. The Former Employees' continue to benefit from their wrongs and the unfair advantage they gained from Porters in violation of these policies.

88. As a result of the Former Employees' conduct, Porters suffered damages.

89. The Former Employees should be enjoined from using Porters confidential and proprietary information, soliciting and servicing Porters' customers, and otherwise competing against Porters based on the unfair advantage they procured as a result of their wrongful conduct.

WHEREAS, Plaintiff Porters respectfully requests the Court enter judgment against Defendants in favor of Porters and award Porters injunctive relief to prevent continued irreparable harm and money damages to compensate it for the harm caused by Defendants.

**Count V**
**Breach of the Duty of Loyalty**

90. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

91. During the period of their employment with Porters, the Former Employees owed a duty of loyalty to Porters. The Former Employees also owed a duty of secrecy.

92. By giving Porters' competitor, Sprint Lumber, detailed information about its operations, trade secrets, employment information and compensation structures, business operations and structure, and calling on customers, the Former Employees went beyond preparation and engaged in direct competition against Porters. While they were employed, the

Former Employees acted in their interests or the interests of Sprint Lumber, contrary to Porters' interests.

93. Porters seeks damages against the Former Employees for their breach of duty of loyalty and secrecy, including lost revenue, the compensation paid to the Former Employees during the time periods in which they breached their duties, and all other damages available under the law.

94. The Former Employees' breach was outrageous such as to constitute evil motive or reckless indifference to Porters' rights, warranting an award of punitive damages.

WHEREAS, Plaintiff Porters respectfully requests the Court enter judgment against Defendants in favor of Porters and award Porters injunctive relief to prevent continued irreparable harm, money damages to compensate it for the harm caused by Defendants, punitive damages that are fair and reasonable yet will serve to deter Defendants from similar conduct in the future, and any other relief the Court deems just and proper.

**Count VI**
**<u>Tortious Interference with Business Expectancy</u>**

95. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

96. As a result of its long-standing business and commitment to customer service, Porters has developed repeat customers for which it has a reasonable, valid business expectancy and probable future business relationship.

97. Defendants were aware of Porters' relationships and valid business expectancies.

98. Without justification, Defendants intentionally interfered with this valid expectancy by inducing or causing a breach of that relationship by undercutting Porters' business, taking advantage of Porters' investment in the Former Employees' relationships with

its customers, soliciting these customers, and destroying Porters' information pertaining to these customers.

99. Defendants' acts were not justified and caused Porters damages, including lost revenue.

100. Defendants' conduct was outrageous such as to constitute evil motive or reckless indifference to Porters' rights, warranting an award of punitive damages.

WHEREAS, Plaintiff Porters respectfully requests the Court enter judgment against Defendants and in favor of Porters and award Porters injunctive relief to prevent continued irreparable harm, money damages to compensate it for the harm caused by Defendants, punitive damages that are fair and reasonable yet will serve to deter Defendants from similar conduct in the future, and any other relief the Court deems just and proper.

**Count VII**
**Civil Conspiracy**

101. Plaintiff Porters incorporates by reference the allegations in all paragraphs of this Complaint as though fully set forth in this paragraph.

102. By coordinating together and agreeing to engage in a course of conduct in violation of the above-alleged statutory and common-law duties, Sprint Lumber and Laderoute furthered a concerted design that resulted in damage to Porters.

103. The Former Employees, Sprint Lumber, and Laderoute had a meeting of the minds on an unlawful objective by agreeing to misappropriate and delete confidential information, trade secrets, and customer contacts, exceed their authorized access to Porters' computer systems, breach their restrictive covenants, and to have the Former Employees directly compete against Porters despite their duty of loyalty.

104. Sprint Lumber and Laderoute committed acts in furtherance of the conspiracy by encouraging and assisting the Former Employees in their unlawful acts, including providing computer systems to "backup" Porters' information, facilitating the misappropriation and deletion of protected information, and accepting the benefits of the Former Employees' months-long breaches of the duty of loyalty.

105. As a result of this conspiracy, Porters suffered damage.

106. Defendants' conduct was outrageous such as to constitute evil motive or reckless indifference to Porters' rights, warranting an award of punitive damages.

WHEREAS, Plaintiff Porters respectfully requests the Court enter judgment against Defendants and in favor of Porters and award Porters injunctive relief to prevent continued irreparable harm, money damages to compensate it for the harm caused by Defendants, punitive damages that are fair and reasonable yet will serve to deter Defendants from similar conduct in the future, and any other relief the Court deems just and proper.

Date: May 9, 2016

Respectfully Submitted,

*/s Todd P. Graves*

Todd P. Graves, MO #41319
Dane C. Martin, MO #63997
Joseph M. McGroder, MO #68246
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel: (816) 256-3181
Fax: (816) 256-5958
tgraves@gravesgarrett.com
dmartin@gravesgarrett.com
jmcgroder@gravesgarrett.com

***Attorneys for Plaintiff Porters Building Centers, Inc.***

STATE OF MISSOURI )
) ss
COUNTY OF BUCHANAN )

**DECLARATION**

COMES NOW Kent Porter, and states under penalty of perjury as required by 28 U.S.C. § 1746, that the allegations in the foregoing Verified Petition are true and correct to the best of his knowledge, information, and belief.

Kent Porter