IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

PORTERS BUILDING CENTERS, INC., )
)
         Plaintiff, )
)
vs. )   Case No. 16-06055-CV-SJ-ODS
)
SPRINT LUMBER, et al., )
)
         Defendants. )

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pending is Plaintiff's Motion for Preliminary Injunction. Doc. #116. For the following reasons, Plaintiff's motion for preliminary injunction is denied.

### I.    BACKGROUND

Plaintiff Porters Building Centers, Inc. sells building supplies and lumber to commercial contractors and homebuilders in Missouri and Kansas. Porters' stores are located in Kearney, Cameron, and Laurie, Missouri; and Elwood, Kansas. In 2003, Defendant Jerry Downey began working for Plaintiff. Defendants Ray Meng, Jess Reynolds, and Sheila Higdon began working for Porters in 2003, 2007, and 2010, respectively. These four individuals ("Former Employees") worked at Porters' Elwood store. Upon hiring, the Former Employees signed acknowledgments indicating they received a copy of Porters' handbook. Doc. #1-2. Both the handbook and the acknowledgment stated the handbook was not a contract and did not create contractual obligations between Porters and its employees. *Id.* The handbook and acknowledgments also informed employees that policies could be changed by management without prior notice. *Id.* The Former Employees did not execute non-compete, non-solicitation, or non-disclosure agreements with Porters. Downey, Higdon, and Reynolds resigned from their employment with Porters on April 22, 2016. Meng resigned from his employment on April 28, 2016.

On May 2, 2016, the Former Employees began working for Defendant Sprint Lumber, Inc. Sprint Lumber sells lumber and building materials to commercial builders

from its locations in St. Joseph and Platte City, Missouri. Defendant Scott Laderoute is the president and owner of Sprint Lumber. In December 2015, Downey reached out to Sprint Lumber about potential employment. From January 2016 through April 2016, Downey and Laderoute communicated about Downey and other employees leaving Porters and joining Sprint Lumber. Eventually, Reynolds and Higdon also began communicating with Sprint Lumber about potential employment.

Prior to their resignation from Porters, the Former Employees communicated with several customers they serviced at Porters regarding their impending move to Sprint Lumber. Higdon and Reynolds provided Sprint Lumber credit applications to several Porters' customers while still employed with Porters. Many of these customers had worked with Higdon and Reynolds for several years, and had moved their business to Porters when Higdon and Reynolds became employees of Porters. The Former employees did not take orders for Sprint Lumber from Porters' customers while they were still employed with Porters. Other facts specific to the claims related to the pending preliminary injunction motion will be discussed *infra*.

On May 9, 2016, Porters initiated this lawsuit and sought a temporary restraining order. Docs. #1-2. On May 12, 2016, the Court denied Porters' motion for temporary restraining order. Doc. #8. On May 23, 2016, Porters filed its First Amended Verified Petition for Damages and Injunctive Relief, asserting nine claims against Defendants. Doc. #9. The parties undertook discovery in support of Porters' pursuit of a preliminary injunction. On October 19, 2016, Porters filed its motion for preliminary injunction, seeking injunctive relief related to its claims of computer tampering, misappropriation of trade secrets, breach of duty of loyalty, and tortious interference with business expectancy. Doc. #116. This motion became fully briefed and ripe for consideration on December 5, 2016. A hearing on Plaintiff's motion was held on December 14 and 15, 2016, at which counsel and all parties appeared. The parties also submitted proposed findings of fact and conclusions of law. Docs. #179, 181-82, 185-86.

## II. DISCUSSION

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis,* 346

F.3d 841, 844 (8th Cir. 2003) (internal citation omitted). In deciding whether to grant or deny a motion for preliminary injunction, the Court must consider four factors: (1) the movant's likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships to the parties; and (4) the impact of the injunction on the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dataphase Sys., Inc. v. CL Sys. Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

### A. Likelihood of Success on the Merits

The most important of the preliminary injunction factors is the plaintiff's likelihood of success on the merits. *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). At the preliminary injunction stage, the movant must establish "a substantial likelihood of prevailing on the merits of [its] claim." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007). This Court, however, need not decide whether the movant will ultimately succeed on its claims. *See Noodles Dev., LP v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030, 1034 (E.D. Mo. 2007) (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991)).

### (1) Computer Tampering

Porters seeks an injunction with regard to its computer tampering claim. Porters contends the following conduct equates to computer tampering: (1) Downey's and Higdon's copying of data from their Porters-issued cell phones to their Sprint Lumber cell phones; (2) Higdon's deletion of all data from her Porters-issued cell phone; and (3) Downey's deletion of thousands of emails from his Porters-issued email account.

The owner of a computer system may bring a civil action against any person who violates the Missouri Computer Tampering Act. Mo. Rev. Stat. § 537.525.1 (2016).

> A person commits the crime of tampering with computer data if he knowingly and without authorization or without reasonable grounds to believe that he has such authorization: (1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network: or (2) Modifies or destroys data or programs or supporting documentation residing or existing external to a computer, computer system, or computer network; or (3) Discloses or takes data,

3

> programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; (4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network; (5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person; (6) Receives, retains, uses, or discloses any data he knows or believes was in violation of this subsection.

Mo. Rev. Stat. § 569.095.1(1)-(6) (2016). Although unclear from the statute, the parties presume this law extends to cell phones. At this time, the Court will do the same.

Porters issued cell phones to Downey and Higdon. Porters never directed Downey or Higdon on the permissible (or impermissible) uses of their company cell phones (other than a prohibition against using cell phones while driving or operating heavy machinery), and they were not instructed on retention or deletion of data on their cell phones. Doc. #1-2, at 39. No one at Porters monitored employees' cell phone use. The Porters-issued cell phones were utilized for personal reasons, including text messaging, emails, photographs, and phone calls. While still employed with Porters, Downey and Higdon copied information, such as contacts, photos, and text messages, from their Porters-issued cell phones to cell phones they now use at Sprint Lumber. Before returning her phone to Porters, all information from Higdon's cell phone was erased.

Porters issued an email account to Downey. He was not instructed on how to utilize his email account, and he was not instructed on email retention or deletion. No one at Porters monitored employees' email accounts. Downey used his Porters email account for personal reasons. Before concluding his employment with Porters, Downey deleted several thousand emails from his Porters-issued email account. During the hearing, Porters admitted Downey did not violate Porters' policies when he deleted emails. Porters also admitted Downey's deleted emails were retrievable by Porters and were, in fact, retrieved.

Given the evidence elicited during the hearing, it is unclear whether Downey and Higdon had reasonable grounds to believe they had authorization to copy and/or delete information contained on their cell phones or if Downey had reasonable grounds to

4

believe he had authorization to delete emails. Based upon the evidence presented at the hearing, Porters has failed to establish a likelihood of success on its computer tampering claim.

### (2) Breach of Duty of Loyalty

Porters argues the Former Employees breached the duty of loyalty by, among other things, soliciting Porters' customers to open accounts with Sprint Lumber; disparaging Porters' business while bolstering Sprint Lumber's business; agreeing among themselves to leave Porters simultaneously; creating accounts for Sprint Lumber at Porters' preferred vendors; and disseminating confidential information.

"Every employee owes his or her employer a duty of loyalty." *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 15 (Mo. banc 2012) (citation omitted). A breach of duty of loyalty "arises when the employee goes beyond the mere planning and preparation and actually engaged in direct competition, which, by definition, is to gain advantage over a competitor." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 959 (8th Cir. 2007) (quoting *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 479 (Mo. banc 2005)). An employee may not "solicit customers for his rival company." *Id.*

The first issue is whether the Former Employees merely planned and prepared to engage in direct competition with Porters or whether they breached the duty of loyalty. It is undisputed that the Former Employees contacted many of Porters' customers to inform the customers of the Former Employees' impending departure from Porters, and the Former Employees provided Sprint Lumber credit applications to Porters' customer while the Former Employees were still employed with Porters. The parties dispute whether the provision of credit applications is preparation or a breach of duty of loyalty.

Ladourete testified that submission of a credit application is a necessary first step for the creation of an account with Sprint Lumber. Credit transactions cannot occur at Sprint Lumber without a credit application being submitted to and accepted by Sprint Lumber. There was no evidence of any credit applications being accepted by Sprint Lumber until after May 2, 2016, when the Former Employees began working for Sprint Lumber. Further, there was no evidence of any sales to former Porters' customers until after May 2, 2016.

5

It is disputed whether the Former Employees shared Porters' quotes, bids, or margins with Sprint Lumber, or the Former Employees have utilized Porters' quotes, bids, and margins after leaving their employment Porters.  The parties also dispute whether Reynolds "took" orders from Porters and gave them to Sprint Lumber.  Given the disputed facts, the Court finds Porters has not established a likelihood of success on its breach of loyalty claim as it relates to the Former Employees' contact with customers.

In addition, Porters claims the Former Employees breached the duty of loyalty by using Porters' confidential information in that the Former Employees used and/or shared, among other things, prior bids, quotes, orders; its delivery procedure; pricing; and information related to Porters' top customers.  An employee "may not use confidential information peculiar to or acquired from his employer."  *Synergetics*, 477 F.3d at 959.

An "employer-employee relationship is not, by itself, sufficient to cause a confidential relationship to exist as to knowledge which is the natural product of the employment."  *National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 35 (Mo. banc 1966) "There must be either an express understanding as to the confidential nature of the information or it must be acquired under such circumstances that the employee must necessarily be aware of the confidence reposed in him."  *Id.*  Porters' handbook informed employees that "contracts, customer lists and information, pricing information, marketing information, vendor/supplier information, financial information and personnel information" were not to be shared without anyone outside of Porters.  Doc. #1-2, at 32. While Porters indicated in its handbook that such information was confidential, the evidence presented by the parties renders this issue more complex.  That is, there are disputed facts as to whether certain information was indeed confidential – to wit, whether it may be "peculiar to or acquired" from Porters.  This is because much of the information the Former Employees took with them to Sprint Lumber came with them from jobs with prior employers when they accepted positions with Porters.

There are disputed facts as to what information is ascertainable through the Former Employees' knowledge, memory, and experience, which would not be protected.  There are also disputed facts regarding what direction, if any, employees

6

were given with regard to protection of information Porters deemed confidential. Given these disputed facts, the Court finds Porters has not established a likelihood of success on its breach of loyalty claim.

### (3) Misappropriation of Trade Secrets

Porters contends it has a reasonable likelihood of success on the merits of its claim for misappropriation of the following trade secrets: (1) Top Customer Reports and customer-specific data contained therein; (2) profit and loss information, including expenses, employee compensation information, top-selling products, and product turnover rates; (3) historical quotes, bids, and invoices; and (4) receiving procedures. Under the Missouri Uniform Trade Secrets Act ("MUTSA"), an "[a]ctual or threatened misappropriation" of a trade secret "may be enjoined." Mo. Rev. Stat. § 417.455. A trade secret is a "formula, pattern, compilation, program, device, method, technique, or process" that: "(a) derives [actual or potential] independent economic value…from not being generally known to, and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Mo. Rev. Stat. § 417.453(4).

To demonstrate a misappropriation of trade secrets, one must show: "(1) a trade secret exists, (2) the defendant misappropriated the trade secret, and (3) the plaintiff is entitled to either damages or injunctive relief." *Central Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. banc 2014). A misappropriation occurs when "one acquires a trade secret through 'improper means,' that is, through such means as theft, bribery or inducing one to breach a duty of secrecy…or when one disclosing a trade secret without consent…knew or had reason to know that the secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 683 (8th Cir. 2002).

Missouri courts recognize "in the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally; the employer's product becomes associated in the customer's mind with that representative." *Zemitzsch*, 712 S.W.2d at 421-22. Customer contacts are not protectable under a

7

theory of confidential relationship or trade secret. *Id.* at 422. The proper means for protecting customer contact is a non-competition agreement. *Id.* at 422 (citation omitted). "Customer lists are protectable as trade secrets only when they represent a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it." *Brown*, 291 S.W.3d at 777 (internal quotation and citation omitted). To be protected, a customer list "must be more than a listing of firms or individuals which could be compiled from directories or other generally available sources." *Id.* (citation omitted).

Based upon the evidence presented by the parties, the Court cannot, at this juncture, find Porters has a substantial likelihood of success on the merits of its misappropriation of trade secrets claim. The information and documents Porters contended were trade secrets in its pending motion for preliminary injunction – its receiving procedure, top customer list, pricing, profits, losses, bids, quotes, and invoices – do not seem to fit within the definition of trade secret. Mo. Rev. Stat. § 417.453(4). Perhaps a full record may lead to different conclusion, but for purposes of the pending motion, the record is insufficient to show Porters is likely to succeed on the merits of its claim of misappropriation of trade secrets.

### (4) Tortious Interference with Business Expectancy

Porters contends Defendants intentionally interfered with Porters' business expectancy by soliciting Porters' customers on Sprint Lumber's behalf, misrepresenting the relative quality of lumber carried by Porters, and redirecting at least one customer from Porters to Sprint Lumber. Tortious interference with business expectancy requires (1) a valid business expectancy; (2) defendant's knowledge of the relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages. *Synergetics*, 477 F.3d at 959. "[A] regular course of prior dealings suggests a valid business expectancy." *Sloan v. Banker's Life & Cas. Co.,* 1 S.W.3d 555 (Mo. App. 1999). Porters' tortious interference claim is largely based upon the same allegations supporting its breach of duty of loyalty claim. For the reason reasons set forth *supra*, section II(A)(2), the Court cannot, at this time, find Porters has established a substantial likelihood of success on the merits of this claim. Because

8

Plaintiff has not established a substantial likelihood of success on the merits of the claims its preliminary injunction is based, this factor weighs against entry of a preliminary injunction.

### B. Irreparable Harm to Plaintiff Absent an Injunction

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959). Irreparable harm occurs when a party has no adequate legal remedy, typically because the party cannot be fully compensated through a damages award. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.*, 346 F.3d at 844 (citations omitted).

Based upon the parties' briefing and the evidence and testimony submitted during the hearing, the Court finds Porters has an adequate legal remedy. In fact, Porters' corporate representative, Alex Porter, so testified in his deposition in this case. Doc. #118-45, at 149.. The harm to Porters, which, to a large extent has already occurred, can be remedied through damages. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (citation omitted) (finding the district court properly analyzed the irreparable harm factor when determining the harm to the plaintiff had mostly already occurred and could be addressed through a damages award). Porters' claims arise from actions that have already occurred. Given this, it is unclear how injunctive relief would assist Porters. Accordingly, this factor also weighs against entry of a preliminary injunction.

### C. Balancing of Harms

The balance of harms analysis examines the harm of granting or denying the injunction upon the parties to the dispute and other interested parties, including the public. *See Glenwood Bridge*, 940 F.2d at 372. Based upon the evidence presented by the parties, the harm to Porters, if the Court denies Porters' motion for preliminary injunction, can be ascertained and recoverable as monetary damages. If, however, the Court were to grant the sweeping injunctive relief sought by Porters, including enjoining

9

Defendants from servicing and selling to longtime customers of the Former Employees, Defendants would suffer significant economic harm. As established during the hearing, Sprint Lumber would terminate the Former Employees' employment with Sprint Lumber if the injunctive relief sought by Porters is granted. Thus, this factor augurs against entry of a preliminary injunction.

### D. The Public Interest

The final factor is the impact of granting or denying the preliminary injunction on the public interest. There has been a minimal showing that the relief sought by Porters would serve the public interest. It is important that the public have access to the products and services offered by the parties. *See CDI Energy Servs.*, 567 F.3d at 404 (noting the need to preserve the public's access to services). The relief sought by Porters would prevent Defendants from servicing and selling products to numerous customers. Additionally, restraints on trade and employment are disfavored. *See Caroline Co. v. Lebeck*, 990 F. Supp. 762, 768 (E.D. Mo. 1997). Although there is a public interest in protecting trade secrets, Porters has not, at this juncture, established trade secrets are at issue. For these reasons, this factor weighs against entry of a preliminary injunction.

### III. CONCLUSION

Upon consideration of the four *Dataphase* factors and the arguments and evidence presented by the parties, the Court finds Porters has not met its burden of establishing the propriety of an injunction. Porters' motion for preliminary injunction is denied.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: December 20, 2016    UNITED STATES DISTRICT COURT